you not to be timid about letting us know if you can't hear or can't see what you think you need to or if you have any questions about the procedures, you would help us rather than annoy us if you would raise issues like that and in particular, as I said, let us know if you're having trouble with the audio for any reason. I can't guarantee that we'll fix everything, but we'll certainly try. We're on a tight schedule this morning because there are some additional arguments this afternoon by one of the judges here, so we likely won't be able to give anybody any extra time, but we've tried to give sufficient time that all the arguments can be made. In view of the fact that it's a tight schedule though, I want to repeat things that you've already said because we will more than likely hear you the first time. All right, we begin with Cloud v. Stone. Mr. Roundtree. Good morning. My name is Jim Roundtree. I represent the family of Joshua Cloud. Joshua Cloud was an extremely gifted young man. He was also handicapped. He could not hear, but he was able to go through school, college, get a degree in electrical engineering in four years. His ability to read lips, concentrate, and be brilliant. As I understand it though, it's significant to this case, and I'm asking you this so you can comment, that the officers did not know that he had any kind of a hearing difficulty. I don't think that's a factor. I grant that the officer did not know because he too had a hearing problem. As I said, the young man went through college in four years with a degree in electrical engineering. Until the day he was shot and killed, an observer of his life would believe that he had overcome his handicap. He spent the summer in Colorado in a Whitewater River Guide, and he was coming home when he observed speeding. He was stopped across the street from the Simsboro High School by Deputy Kyle Luker. As I said, Deputy Luker also had a hearing problem, so it's quite possible that he could not pick up on what's called deaf speech. He filed a claim with the Veterans Administration. Is there anything in the record that you can point to that shows that the deputy should have known about your client's hearing problem? In the record, there is a school project, and I think the typical juror would recognize deaf speech. I'm not sure that Deputy Luker did, and I don't think it's important. But there's nothing in the record that suggests that he knew or should have known? No, I'm not saying he should have known. I think he should, but I don't think that's critical to my case. Well, one reason why it might be critical, Mr. Hyte, one reason why I think my colleagues, and I'm certainly interested in it, is if the officer should have known or did know, then when Mr. Cloud turned, he might have should have been on notice, oh, well, he's turning so he can read my lips because he can't hear my commands. But as I, you know, and you can contradict me if I'm wrong, as I read the record, there's an exchange going on. The officer's speaking, Mr. Cloud's speaking back, and, you know, there's some disagreement. Mr. Cloud doesn't want to sign the ticket. I get all that, but there seems to be a verbal exchange going on. Is that right? To some extent, correct. Yeah. Okay. I think I can, I think I can address that to your satisfaction if you give me just a moment. I wanted to point out that Deputy Luker filed a claim for disability with the VA four months after he was hired by the sheriff. He listed as a cause for disability benefits, hearing loss, PTSD, anxiety, panic attacks, right arm nerve damage, chronic sleep apnea, possible brain injury from combat duty. He later withdrew that application. Tuesday, the 29th of August, 2017, was following a shift ending at 6 a.m. on Monday. He attended a class on Monday and went to work Tuesday, the day of the shooting, at 7 a.m. He was annoyed because Joshua argued about whether he was speeding or not. He was even more annoyed when Joshua declined to sign the ticket. But he did not say, it's not an admission if you sign the ticket. He did not say, I'm going to take you to jail if you don't sign the ticket. He went back to his unit, put down his book, turned around, went back to the truck, told Joshua to get out of the truck, turn around, face the truck, put your hands behind your back. Joshua complied with those instructions. When Deputy Luker put the handcuff on his left hand, he made a quarter turn to look at him. He made some statement that Deputy Luker could not recall during the interview with the state police three days later. But he said something. When Deputy Luker reached for his right hand, Joshua turned all the way around and faced him. That's when Deputy Luker flipped out. And I think this exchange during his deposition will answer your question. When you were applying handcuffs, he could not look straight at you, could he? Answer. No, no one looks at me when I apply handcuffs. Question. And your complaint was that he made a quarter turn toward you. Correct? Correct. That would have enabled him to read your lips. That's resisting arrest is what that is. Have I understood your testimony accurately to say your knowledge that Joshua Cloud was deaf would not have affected the outcome that day? Answer. No, it would not. Is it possible that an awareness on your part of his deafness could have enabled you to avoid the wrestling match and the shooting? No. Noncompliance is noncompliance. Deputy Luker never said that Joshua pulled his arm away from him. He just said that he turned and faced him directly. Is it as I understand the facts here, when he turned to face him, when Joshua turned to face the officer, there was the handcuff was dangling from one hand. On one hand, yes. Because I take that to mean the officer had put the handcuff or I don't remember if it was left or the right wrist. It was dangling from one hand when he faced the officer. That's correct. He'd apply the handcuff to the left hand. And when Joshua turned around after he tried to, after he reached the right hand, it was dangling there. That's correct. So let me ask you this. So this being a qualified immunity case, we also, beyond whether there's been a constitutional violation established, we also have to ask if what the officer did violated clearly established law. I think so. You agree with that? So I'm looking at our Carroll decision from 2015. That's our court. You're probably familiar with it. 2015, it's an opinion by Judge Prado. In that case, Carroll, we said as of, let's see, we said as of October 2006, the law was not clearly established that using a taser to gain compliance of an unarmed seated suspect for resisting arrest and failing to follow verbal commands was clearly excessive and objectively unreasonable. So we gave the deputy there qualified immunity on the clearly established law prong. What's, what has changed, I guess, since that with respect to tasing? Because here, you know, here we have at least what sounds like a similar I can't understand exactly everything. I'm missing most of what you're saying. But I will tell you this, and I think maybe it goes to your question. It's really important to look exactly at what was said and what was not said, because a lot of it is what's not said. For example, I'll take you to jail if you don't sign this ticket. The, the events leading up to the point where they were standing face to face did not justify the tasing. This, this is what happened when, when Joshua turned to face the officer. I create distance, pull my taser, deploy, direct hit in the chest right here, probably go through two cycles. That was too close to incapacitate. He admitted that. I get that. I guess my question is what law clearly establishes that that action by the officer was unreasonable? I think it's Newman versus. Okay. Newman versus Gay. Okay. And I will address that. And I think Ramirez versus Martinez goes to that issue as well. Well, do you, do you, do you agree that tasing is acceptable if there is active resistance? I understand that you say this was not active resistance, but in a case of active resistance, do you agree that the law is that tasing is permissible? Yes. Yeah, absolutely. Uh, and in fact, this at first tasing, despite what you said in Ramirez versus Martinez, I'm not sure that really should be considered excessive force. Uh, it's what went on after that. Uh, Deputy Looper said at that point, and when, after he tased him and he pulled it out and screamed at that point, I knew it was fixing to go bad, really bad. So I still had my distance. I used my remote control pop lock on my door. Takes a second and a half to open it. The door for my canine. I hear two audible clicks. The door opens. I hear the dog on the ground from his feet. This is state trooper Harwell. Right. So he's still not coming at you. Looper. Nope. We're still. Harwell. Now y'all are at a distance. Looper. Right. Harwell. He's done pulled the leads out, then some kind of yell or whatever. Now he's just standing there. You're standing there. You activated the canine release. Looper. Right. Harwell. So now the dog's coming out, I take it. Looper. The dog is on the ground. I don't know where the dog is. Harwell. Listening. Looper. I'm still listening to make sure the dog is on the ground. Harwell. Is he saying anything to you at this point? Are y'all talking? I don't know. I can't tell you. Looper. At this point, he turns his right side to the vehicle. Looper. All right. I come in with my taser because I'm going to drive stun him right below the rib cage in that meaty part there. Looper. I come in, drive that taser in. Harwell. All right. With that, I guess I would take it your adrenaline is pumping now. You probably have some weight behind it. You probably push him now. He hits the truck or does he fall yet? He has to because I'm not going to just stand there. I'm trying to get control. I'm trying to get him in there so I can get those arms. Looper. Drive the taser in. Activate. Harwell. Activate. Looper. Activate the taser again. Pull the trigger. It's going and we slowly start sliding to the opening of the door. That, I think, is resorting to overwhelming force without making some kind of effort to obtain compliance without that. Now, remind us as this sequence of events occurred, at what point did Mr. Cloud reach into his truck and obtain a weapon? That didn't exactly happen. According to Deputy Looper's description, he forced him into the cab of the truck and then he saw the profile of a revolver coming under the wheel. Where was it? Sorry, where was the revolver? That's a point I've never been able to figure out. I've spent a lot of time trying. Well, in the truck. It was in the truck. Presumably on the ground. Sorry? Presumably on the floor or the bed of the truck. I think his father said he kept it between the seat. Oh, okay. It looks to me like it had to be closer to the door, but I don't know. But it's undisputed there was a gun. There was a gun and it was his. Yeah. As I said, I believe that's resorting to overwhelming force without making an effort to engage the defendant in any negotiation with her. We find that quickly breaking the diver's side when a drug in her hand was excessive was not qualified immunity. The defendants argued and the district court agreed that this was resisting arrest. But I think if you look carefully at the facts of Ramirez versus Martinez, that's wrong. Your court discussed that in Joseph versus Bartlett last November, and this is what you said in Ramirez versus Martinez. Construing the facts in the plaintiff's favor, we found that the officers exerted force in violation of the Fourth Amendment by immediately tasing and forcing to the ground a person whose only resistance was merely failing to comply with orders to put his hands behind his back and pulling his arm away. When an officer grabbed his hand, we concluded that he posed so little threat that tasing him before he was handcuffed was excessive and tasing him after he was handcuffed and subdued while lying face down on the ground was even more so. There's more that I would like to read you from that case, but my time is running out. As I said before, I think a jury would find that the resistance was passive. I know the district court said it was active, but I believe, you know, in cases where things are disputed like this, the benefits should go to the plaintiff. I think Newman versus Guidry, Cooper versus Brown, and Martinez, Ramirez versus Martinez, show that it's established law that you cannot go to excessive force like this without doing some lesser effort to avoid it. Your initial time has expired, Mr. Rountree. May I take part of my rebuttal time? You may certainly take it. You have five minutes rebuttal, so you'll be taking that. I understand that. I'll take less than that, I hope. Legal force was also unnecessary. As your court said, this may be one of the cases where the exercise of force that is reasonable at one moment became unreasonable if the next justification, if the cause of justification has ceased. Quentin Crowe remembered Deputy Luker repeatedly demanding that Joshua get on the ground and Joshua say, what did I do? Crowe's video shows Deputy Luker in complete control after the struggle for the gun. Exhibits 1720 and 1721 show Deputy Luker in a combat stance eight to ten feet back from Cloud while Cloud was under attack from the dog. He said in the interview with the state police he didn't shoot him earlier because he knew Officer Watts was on the way and he had distance and control. The video shows Luker moving closer and closer as he's shouting to Cloud to get on the ground, which he couldn't possibly hear while he was fanning off the dog. Deputy Watts did not corroborate Luker's story that Joshua was jiving for the gun. He said Cloud rolled over toward it after he was mortally wounded. Crime scene photographs appear to show seven feet between Cloud's body and the gun. If he rolled toward it, he could not have been going in the direction of the gun when he panicked to try to get away. A reasonable police officer would never have allowed this situation to get out of hand, but when he did, he would have arrested Joshua rather than kill him. All he had to do was wait 12 seconds for help to arrive. All right, thank you Mr. Arantri. You have three minutes remaining for your rebuttal. Thank you. Mr. Richardson. Thank you, Your Honor. May it please the court, Tim Richardson on behalf of the appellees. I think a few facts, I think that are important and I won't go through all of them, but there's a few from the record just to outline what did happen. There were a few questions about when the gun was shot. We do know that the date was August 29, 2017. We do know that how this event started was that Joshua Cloud was speeding. He was coming from Colorado, going back to Tennessee. Deputy Luker was doing a road traffic evaluation on I-20. He sees and he clocks Joshua Cloud speeding. He pulls him over, he issues him a ticket, and I think what's important, Judge Duncan, to your question, whether there was any kind of communication problem, because when he pulled him over, he ordered him out of the vehicle and he complied. Then, after he ordered him out of the vehicle, he asked him, he gives him the ticket. If you won't sign the ticket, there's a discussion about that. Then he tells him, go ahead and place your hand behind your back, and he complies. So, you know, this isn't a situation where you're talking to someone and they're not understanding what's happening, certainly to the deputy, because he's giving them verbal instructions. So, he does comply with that. He secures the wrist. Once he secures that left wrist, then Cloud turns again, starts arguing with him over the ticket, indicating an understanding and an exchange about what was happening that day. Then, when he still doesn't sign, the deputy says, give me your other wrist. Now, he pulls away. This is the second time. So, the first time he pulls away when he tries to cuff the one wrist, the left wrist, he pulls away. Then he turns back and starts arguing with the deputy. Then, when he tries to cuff the other wrist again, now he's facing and he's right by the door that is open in the truck. At that point, that's when the taser is deployed. And I'll get into a minute about the reasonableness of that, but just to kind of go through what happens from there. The taser is deployed. Joshua Cloud still does not comply. He pulls out these leaves and what he determined and what was the taser, the taser leaves are gone because Cloud has pulled them out. And he dry stuns him to try to get him to stop and to comply. Still does not comply. And then what happens, it's not Luca that gets upset or that introduces a weapon into the situation. Cloud goes into the truck, which the door is already open. And to answer your question, Judge Duncan, the revolver was under the steering wheel. It's under the steering column. As he goes in, Cloud grabs the revolver, points it at Luca, fires two shots. One of those shots hits Deputy Luca in the chest. Now, thank God he had a vest on that day or he wouldn't be with us. But the bullet penetrated the vest. He was bleeding. He was injured. Deputy Luca, to his credit, is now able to get his hands on the gun, which Cloud has already shot him. He's wounded. He's got the gun. They're struggling for the weapon. Eventually, Luca is able to get that weapon and is able to get it down and kick it behind him. Doesn't shoot Cloud, doesn't dry stun him, doesn't do any additional force, but is protecting himself. What we now know is that Luca is injured. He believes, according to his testimony, he shot me once. He's going to kill me if he gets his hands on this gun. It's a while. He's telling him, ordering him, get on the ground, stop, get down. He's not complying. He has to release the canine. The canine comes out. He's still telling Cloud, get down, stop. He's not doing it. Nothing happens until Cloud, as he continues to disobey the orders, and this is undisputed, lunges past the deputy to the weapon, which is here. At that point, Deputy Luca had to make a decision, and he made the decision to take lethal force. Remind me, the video, the cell phone video, does it capture the lunge? I know it's spotty in terms what it captures. What does it capture, in your view? That's a great question. That video is very, it's a lot of gaps in the video because there was an individual across the street who was a janitor who was trying to film it, but he was also calling to let people know what was going on. So, to answer your question, no, it did not, but what was captured, two things, to answer your question. There was a Deputy Watts who was en route. Remember, Luca didn't have any backup, which is part of the reason why I think what he did was reasonable. We have Watts coming. When Watts arrives at the scene, his testimony, which was undisputed, says, I'm getting up, I'm coming to the area, and I see Cloud going past the deputy toward the weapon. So, his testimony was, yeah, he saw it. Also, too, the individual who was taking the video across the street said, in his words, it looked like Cloud was, quote, busting a move, right? So, we all know he's going in the direction of that weapon. In the deputy's mind, the reason that he's going for that weapon is to get control of it and finish what he had started, and it's not a question of what he might do, right? We have a lot of questions in this court and cases, and we'll get to them in a second, where what could happen? You know, does the person have a weapon? Might they harm you? This is not this case. I mean, this deputy had already been shot in the chest. Two shots had gone off, not by anything the deputy introduced, but by something that the individual pulled out of his truck and fired at the deputy twice. So, to answer your question, once that's done, he believed that Cloud was going for the weapon, and he took action. I think there's a couple issues, and one, we addressed the the ABA issue, and I'll start with that one first because it was first addressed by counsel. If we're looking at ADA, the plaintiff has to prove a disability. I thought that issue was not being pursued on appeal. Is that right? I agree. I didn't see it briefed at all. I don't know why you need to spend time on it. I won't. That's fine. I agree, Your Honor. I just didn't know, since it was addressed, I wasn't going to address it, but I agree with you. It's not briefed. But I believe it is briefed. So, let me just, I'll just get to, what I want to hear you talk about is, I asked Mr. Roundtree about clearly established law because that's an important part of a qualified immunity, as you know, and so he identified Newman v. Gadrey and Ramirez v. Martinez, I believe, as cases that clearly established the law that what the deputy Lugar did here was objectively unreasonable, and I'd like to hear your response. Yeah, I disagree with that, and I think those cases are distinguishable because this is not a case where he's classifying as no resistance, and it was someone's cuffed, and then you can't use a taser because there's no active resistance. I haven't found a case where someone is actively resisting, not just once, but twice. So, he puts the cuff on first, right, and then there's no tasing going on, but he turns, and there's no backup, and he's turning, he's still got a cuff on, and he's turning toward the officer, and then there's a discussion, then he comes back and tries to put this other cuff on. Now he does a full turn back at the officer, still resisting, after discussion, with an open door to a cab, which we know in hindsight had a gun. We didn't know that then, but under those circumstances, when you have an individual for a period of time with two distinct resistings, when someone has a cuff already on their wrist and is clearly not complying with the deputy's directives, I have seen no case under those facts that says you are not to tase, you are to do something else, or just allow this individual to continue to resist because you can't get him under compliance. The deputy did attempt to get him under compliance. He certainly attempted to place the other cuff on the wrist. He just couldn't do it, and under those circumstances, I believe it's objectively reasonable. I don't even think that we get to the qualified immunity issue on that because I don't think it's a Fourth Amendment violation. I don't think it's . . . Oh, I know, but if we decided to decide this on the, you know, courts have the option to go to the second prong versus the first prong. If we decided to do that, I'm not saying we will, but I just, I mean, I read Mr. Roundtree from our Carroll decision that talked about clearly established law on this point about tasing a seated and unarmed suspect in 2006, and I just, I wanted to understand, well, it's not 2006 anymore. Has the law been clarified? Yeah, I understand, and certainly the court can go to qualified immunity issue. If it gets to that point, I have not seen a case where an individual is actively resisting. I think that's a totally separate situation, and I think the law is and should be that if somebody is actively resisting, causing a threat to the deputy after discussions and after continued attempts to get him under control, that the deputy certainly is justified, but . . . Well, I think that's important because I do think our cases stand for the proposition that you can't go to the taser first. Agree. Right? You agree with that? I do, but I do think that's not what happened here. So he, there was a discussion. He went out, told him to sign the ticket. He said, I'm not doing it. He told him he has a discussion with a man. He cuffs one wrist. They have another discussion. He starts arguing about it, so he doesn't just come and take the taser. This is a minutes and minutes are going past to try to get this straight, and then when he then puts the second cuff on, even at that point, he doesn't deploy the taser. It's not until Clough turns back again for a full turn for the second time. Now we have aggression. This is not, I think this is under these facts, and I agree, Fourth Circuit excessive force cases, they turn on the facts, and under these facts, I have not seen a case that indicates that this would be, clearly establishes a constitutional violation to use tasing under these facts and these circumstances. I hope to answer your question. Again, to get to the Fourth Amendment, we would discuss the tasing, and I think, you know, I won't go any further on that. In terms of the deadly force, which counsel has just recently addressed in the end of his statement there, I think also, if we're looking at the either qualified immunity or regular excessive force, either in state or federal law, which is the same standard, reasonableness, the facts that I see at that point is what happens. Clough has pulled away twice. He's been tased twice with no effect. He's in pure rage. He's gotten back in the cab of the truck. He's pulled a handgun. He's fired two shots. He struck the deputy. The deputy believes he might pass out, doesn't know how kick it behind him. Cloud still not getting on the ground. Cloud continues to move. He gets past the canine and he gets past. What is on that point? What do the location of the wounds show about this? The altercation? Where was he shot? The deputy or for Mr. Cloud? No. Yeah, I'm sorry. For Mr. Cloud. Where was Mr. Cloud shot by the side as he was lunging toward toward the facts? This is not a case of what could happen or might happen. And I want to just address two cases. It's the intervals for city of Rosenberg, Texas. In that case, obviously, the court knows an officer shot a suspect because the officer believed the suspect was reaching into his boot for a weapon. But it turned out there was no weapon. That's five. Sixty four federal third three. Seventy nine. That was two thousand nine. And then Reese versus Anderson. That's nine. Twenty six. Federal second four. Ninety four. An officer. This court found officer was justified in using deadly force when a passenger repeatedly reached below the officer's sight line and the officer believed he was retrieving a gun even though he was determined to be on on. So in those cases, the suspect was actually unarmed. But the officer's reasonable belief, which is what we have to look at, it's the view of the officer believe that his life was in danger. That's in those cases. Again, there was no gun here. There was a gun and we know there was a gun and the officer knew there was a gun because he had been shot by it. So in this case, where where the suspect is moving for the gun that he's already used to shoot the officer, that is much more telling than the other cases where the officer had to think or believe or what he suggests or thought was going to happen. He knows what was going to happen. What's the second case you said? I couldn't hear you. Oh, I'm sorry. Thank you, Reese. I'm sorry. Reese versus Anderson. Nine. Twenty six. That second four. Ninety four. We've discussed qualified immunity. And what I believe in terms of the two, if we're talking about excessive force, which is what this case is about, the tasing, which we've discussed in the deadly force. And again, I think what's important is it has to be viewed in the circumstance or coming from the officer's position, what he saw, what he believed a reasonable officer in that position. And based upon the facts and circumstance of this case, which are undisputed, we believe the district court is correct that there was no violation of the Fourth Amendment. There's also no state violation. And certainly if there was, there would be qualified immunity because this was not clearly established law. That's all I have, Your Honors. I appreciate your time. Thank you, Mr. Richardson. Mr. Roundtree, three minutes. All I can say is please, please look carefully at what Deputy Luker said and what he didn't say. He did not say that Joshua pulled away from him. He said he made a quarter turn toward him and then he made a full turn toward him. He didn't say he did anything that was in the least bit suggestive of active resistance. All he did was look at him. And I will grant you that Deputy Luker would have been justified in shooting Josh at the end of that struggle when he broke free. But the time had changed. The reason, the danger was over. He did not have to shoot Josh. All he had to do to avoid this whole thing that would have saved that life and made his life better was say, listen, if you don't sign this ticket, you're going to go to jail. He didn't say that. He didn't do anything before he went directly in to force compliance. And Josh was not doing anything to provoke that kind of reaction. He would have never been in the camp, never had a gun if Luker hadn't forced him in. I imagine myself in that position and I find it entirely understandable. All of a sudden he stopped for speeding and now there's big guys on top of him sticking a taser in him and knocking him around. Reaching for a gun under those circumstances to me is, I would expect it. I'm sorry it happened. I'm sorry he was forced into that position. It is a terrible case, both for Luker and for the Cloud family. But it didn't have to happen. It was unnecessary on the part of Luker. I mean, the man was obviously sleep deprived and angry and bitter and Joshua was a smart aleck. But that's not reason to kill him. Thank you, Mr. Browntree. Your case is under submission. And to you and Mr. Richardson, and I say this also to all of the attorneys who are here today, how much the court and every judge on this court appreciates your willingness to come here today for in-person argument. We all think that in-person argument is much more beneficial to the court and so we are grateful for your willingness to cooperate with all the special arrangements. Thank you, Mr. Browntree. Your case is under submission.